**Opinion issued September 11, 2025**



In The

# Court of Appeals

For The

# First District of Texas

_____

**NO. 01-25-00195-CV**
_____

**IN THE INTEREST OF J.M., A CHILD**

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-00631J**

---

## MEMORANDUM OPINION

This accelerated appeal arises from a suit brought by the Texas Department

of Family and Protective Services (DFPS) to terminate a parent-child relationship.

After a bench trial, the trial court terminated the parental rights of P.K. ("Father") to

his minor child, "Joseph,"[1] based on its findings that Father engaged in the endangerment grounds for termination[2] and termination of the parent-child relationship was in Joseph's best interest.

Father challenges the trial court's ruling in four issues, contending that the trial court erred in denying his request for a recess or continuance and the evidence is legally and factually insufficient to support the trial court's findings.

We affirm.

## Background

When Joseph was born on March 18, 2023, he tested positive for methamphetamines and showed possible withdrawal symptoms.[3] He had respiratory distress and was slow feeding. He spent a few days in neonatal intensive care.

The hospital tried to call the parents to come pick up Joseph when he was ready for discharge, but neither parent responded. DFPS took custody of Joseph and placed him with the foster mother.

Two days after Joseph's birth, the caseworker investigating the case met with Father at the hospital. Father stated that he was Joseph's father and agreed to submit

---

[1]   We use aliases for the child and Father to protect the child's identity . *See* TEX. R. APP. P. 9.8(b)(2).

[2]   *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E).

[3]   The mother tested positive for methamphetamines and marijuana at Joseph's birth. Her parental rights to her four other children were terminated in September 2022 because of her methamphetamine use. Her parental rights to Joseph were also terminated in the underlying proceeding; she did not appeal that ruling.

to a drug test. He was sent a text message with the address of a drug testing site; a response text message sent to the caseworker stated, "OK."

The caseworker followed up with Father three days later. He told her that he had not seen her text message and agreed to take the drug test the next day. Later, though, the caseworker received a text message from Father stating that the drug testing site would not let him take the test because he did not have identification with him.

Father had two visits with Joseph in 2023. On June 15, 2023, the trial court ordered Father to submit to DNA testing to determine whether he was Joseph's biological father. For the next year, Father was reminded multiple times to submit his DNA but did not do so. Father also avoided service and stopped visiting Joseph even though DFPS offered him visits without his having been served in the underlying suit.

Father's criminal record documents a history of drug abuse. He has a 2017 conviction for possession of less than one gram of methamphetamine, a state jail felony, for which he received a sentence of 240 days. He was convicted on the same charge again in 2019 and received a sentence of 180 days. In 2021, he pleaded guilty to possession of four to 200 grams of methamphetamine, a second-degree felony. The trial court assessed a five-year sentence, deferred proceedings without an adjudication of guilt, and placed him on community supervision for a five-year

3

period. In 2024, after Father failed to report to his probation officer, the trial court granted the State's motion to adjudicate Father's guilt for this charge, revoked his community supervision, and sentenced him to two years' incarceration. Father began serving his sentence in August 2024.

Father also has prior history with DFPS. His parental rights to another child were terminated in February 2019 on both endangerment grounds and constructive abandonment.[4]

Father finally submitted his DNA for paternity testing in October 2024, after he was incarcerated. Father was adjudicated to be Joseph's father on November 8, 2024.

The Department first created a service plan for Father in 2023. Father did not complete any of the services required under that plan. Based on the paternity test, Father's service plan was amended in October 2024 to include parenting classes, random drug testing, a substance abuse assessment, stable income, housing, monthly contact with DFPS, refraining from criminal activity, signing a release for information, and attendance at all hearings, conferences, and appointments. The service plan also noted that Father was incarcerated. During his incarceration, Father completed a class called Authentic Manhood, which, he told his attorney, was something close to parenting classes.

---

[4] *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (N).

Trial took place on September 19, 2024, December 11, 2024, and February 5, 2025. DFPS caseworker Deja Godwin testified to her opinion that it was in Joseph's best interest to terminate the parent-child relationship as to Father because he had not been compliant with his service plan throughout the case and could not provide a safe or stable home for Joseph. Godwin did not consider Father's completion of the Authentic Manhood course as equivalent to parenting class. Noting Father's prior termination on endangerment grounds, Godwin stated that she had not seen anything from Father showing that he would be a safe caregiver for Joseph. Father had only visited the child a couple of times since the case started in March 2023 and did not even submit to DNA testing until he was incarcerated in fall 2024.

Godwin also testified that Joseph was thriving in his current placement and all his needs were being met. He had formed an attachment with both his foster mother and her extended family, and the foster mother was interested in adopting him. Godwin noted that the foster mother made sure that Joseph would know and be bonded with his other siblings, which was important for him, and that he would be able to maintain the sibling connection if he remained with the foster mother. According to Godwin, adoption by the foster mother would be in Joseph's best interest.

The foster mother, who intervened in the case, testified that Joseph was placed with her when he was six days old and has lived with her since that time. She is his sole caregiver.

Since birth, Joseph has had a number of health issues, many of which have been resolved through proper medical intervention and care. Due to a pre-asthmatic condition, he continues to have severe breathing issues that have resulted in two multiple-day hospitalizations. He requires regular inhaler treatments and monitoring so that he receives medication as soon as he shows difficulty breathing. Joseph is also on medication for severe gastric reflux and continues to have some difficulty eating solid foods. He has regular visits with his pediatrician, and the foster mother monitors his food intake to make sure he gets enough nutrition and maintains a healthy weight.

The foster mother described Joseph as a very happy child who loves to talk and interact with people. He does well at daycare. She described their daily routine, which includes morning play time at home, daycare, time at the park, dinner, bath, and story time. She has been intentional about reading to him and teaching him how to look at books and turn the pages. They also practice naming colors and shapes and counting numbers.

The foster mother noted that she has extended family nearby. They are supportive and have regular visits with Joseph. Joseph also enjoys his monthly visits

with his foster cousins and his half-sisters, whom he knows by name. The foster mother explained that it was important for Joseph to know his history and his biological family as well as others in his sphere. She confirmed that Joseph is bonded to her and she is able and willing to adopt him.

On March 5, 2025, the trial court signed a decree terminating Father's parental rights and appointing DFPS Joseph's sole managing conservator.

## Motion for Continuance

In his first issue, Father argues that the trial court abused its discretion by denying his request for continuance.

Rule 251 requires that a motion for continuance be supported by affidavit, consent of the parties, or operation of law. TEX. R. CIV. P. 251. We review a trial court's denial of a motion for continuance for a clear abuse of discretion. *In re L.S.*, 01-24-00106-CV, 2024 WL 5160515, at *9 (Tex. App.—Houston [1st Dist.] Dec. 19, 2024, no pet.) (mem. op.); *In re E.L.T.*, 93 S.W.3d 372, 374 (Tex. App.—Houston [14th Dist.] 2002, no pet.). We cannot substitute our judgment for that of the trial court; instead, we must only determine whether the trial court's action was so arbitrary as to exceed the bounds of reasonable discretion. *In re L.S.*, 2024 WL 5160515, at *9. A trial court abuses its discretion if its decision is arbitrary, unreasonable, or without reference to any guiding rules or principles. *In re E.L.T.*, 93 S.W.3d at 375. If a motion for continuance does not comply with Rule 251's

requirements, we presume that the trial court did not abuse its discretion in denying the motion. *Louison v. Caddette*, No. 01-22-00034-CV, 2024 WL 5249158, at *10 (Tex. App.—Houston [1st Dist.] Dec. 31, 2024, no pet.) (mem. op.). Further, a motion for continuance that does not comply with Texas Rule of Civil Procedure 251 does not preserve error for appeal. *Id.*

Father's counsel was present for all three days of trial but Father was not. Father filed one written motion for continuance before the second day of trial, in which he asked for time to complete his services after his release from incarceration. Father was at the Harris County Jail and was supposed to appear for trial that day through a bench warrant, but he had fallen ill and was placed in quarantine, so he could not appear. In arguing the motion for continuance, Father's attorney added Father's inability to appear as a reason for granting a continuance. The trial court acknowledged that Father's absence was not through any fault of his own but denied the motion.

In a suit filed by DFPS seeking termination of parental rights, the trial court generally loses jurisdiction over the case on "the first Monday after the first anniversary" of the date the court rendered a temporary order appointing DFPS as temporary managing conservator. TEX. FAM. CODE § 263.401(a); *In re J.R.*, 652 S.W.3d 508, 510 (Tex. App.—Houston [14th Dist.] 2022, pet. denied). The case is automatically dismissed on that date unless the court has started trial or granted an

8

extension. TEX. FAM. CODE § 263.401(a). A trial court may extend the dismissal date, and retain the suit on its docket for up to another 180 days, if it "finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of [DFPS] and that continuing the appointment of [DFPS] as temporary managing conservator is in the best interest of the child." *Id.* § 263.401(b).

Here, the record at various points shows dismissal dates for this proceeding of March 21, 2024, September 21, 2024, and March 5, 2025. Father knew about the proceeding and acknowledged that he was Joseph's father shortly after Joseph's birth in March 2023. The trial court appointed counsel for Father early in the proceedings. DFPS facilitated his two visits with Joseph in 2023 and reminded him multiple times about the need to submit a DNA sample for paternity testing. Yet Father did not do so until he was incarcerated, after the September 21, 2024 dismissal date. Father's projected release date was in March 2025, after what was ostensibly the final, extended dismissal date of March 5, 2025.

As for Father's request for additional time to work his services, by stalling on paternity testing, ignoring DFPS's attempts to contact him, and avoiding service of process, Father ran out the clock on any reasonable possibility of completing his services and showing that he was capable of giving Joseph in a safe and stable home. *See In re Y.G.*, No. 01-22-00181-CV, 2022 WL 3362953, at *9 (Tex. App.—

9

Houston [1st Dist.] Aug. 16, 2022, pet. denied) (mem. op.) ("'[W]hen a parent, through his or her own choices, fails to comply with a service plan and then at the time of the termination trial requests a continuance or an extension of the statutory dismissal deadline in order to complete the plan, the trial court does not abuse its discretion by denying the continuance or extension.'") (quoting *In re K.P.*, No. 02-09-028-CV, 2009 WL 2462564, at *4 (Tex. App.—Fort Worth Aug. 13, 2009, no pet.) (mem. op.)).

As for Father's complaint about the trial court's decision to proceed with trial in Father's absence, we note that a parent inmate does not have the absolute right to be present at a trial in which the termination of parental rights is at stake. *See In re Z.L.T.*, 124 S.W.3d 163, 166 (Tex. 2003). It is the inmate's burden to show his right to be present at trial. *Id.* Father's motion did not explain how he would be unfairly prejudiced by a trial in his absence. Thus, this complaint shows no reason for reversal.

We hold that the trial court did not err in denying Father's motion for continuance.

We overrule Father's first issue.

### Termination of Father's Parental Rights

Father argues on appeal that the evidence is legally and factually insufficient to support the trial court's findings that he engaged in the predicate acts set forth in

Family Code sections 161.001(b)(1)(D) and (E) and that termination of his parental rights was in Joseph's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (b)(2).

## A.    Standard of Review

A parent's "right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." *Id.* at 759 (internal quotations omitted). Thus, we strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

At the same time, we remain mindful that "the rights of natural parents are not absolute." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Only "those fit to accept the accompanying responsibilities" are entitled to assume them. *Id.* Recognizing that a parent may forfeit his parental rights based on his actions or omissions—the primary focus of a termination suit is protection of the child's best interests. *Id.*

Thus, in reviewing a challenge to the legal sufficiency of the evidence supporting the trial court's termination of parental rights, we "determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding

11

was true." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022) (internal quotations omitted). "[W]e look at all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (internal quotations omitted). Yet we may not "disregard undisputed facts that do not support the finding." *Id.* (internal quotations omitted). In conducting a factual-sufficiency review in this context, we inquire "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [] allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Under these standards, the factfinder remains "the sole arbiter of the witnesses' credibility and demeanor." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009)). In a bench trial, the trial court, as factfinder, weighs the evidence and resolves evidentiary conflicts. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

## B.    Applicable Law

Section 161.001(b) of the Family Code authorizes an "involuntary termination of parental rights if a court finds by clear and convincing evidence both that a parent engaged in one or more enumerated predicate grounds for termination and that termination is in the best interest of the child." *In re M.P.*, 639 S.W.3d 700, 701–02 (Tex. 2022); *see* TEX. FAM. CODE § 161.001(b)(1)(A)–(U), (b)(2). Generally, "[o]nly one predicate ground and a best interest finding are necessary for termination, so 'a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground.'" *In re M.P.*, 639 S.W.3d at 702 (quoting *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019)).

Although only one predicate ground is necessary to support a judgment of termination, we may not bypass challenges to the sufficiency of the evidence to support findings under subsections 161.001(b)(1)(D) and (E)—"the so-called endangerment grounds." *In re J.W.*, 645 S.W.3d at 748. "Those grounds bear special significance because termination of a parent's rights under either can serve as a ground for termination of his rights to another child." *Id.*; *see* TEX. FAM. CODE § 161.001(b)(1)(M).

"[B]ecause prior termination for endangerment is a predicate ground for a future termination, due process and due course of law require that the court of

appeals review the legal and factual sufficiency of the evidence supporting a trial court's order of termination under Subsections 161.001(b)(1)(D) and (E) when challenged on appeal." *In re M.P.*, 639 S.W.3d at 704.

Here, subsections 161.001(b)(1)(D) and (E) are the only predicate grounds supporting termination.[5] We consider them below.

## C.    Endangerment Findings

### 1.    Section 161.001(b)(1)(D)

Family Code section 161.001(b)(1)(D) authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D).

To establish subsection (D), DFPS must prove that the parent's conduct caused a child to be placed or remain in an "endangering environment." *In re J.W.*, 645 S.W.3d at 749; *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). The suitability of the child's living conditions and the

---

[5]    In a previous decree involving another child, the same trial court terminated Father's parental rights based on the endangerment grounds. Yet the trial court did not invoke Family Code section 161.001(b)(1)(M) as a basis for termination here. Because no party raises the issue, we do not consider whether, under these circumstances, a review of both endangerment grounds is still necessary. We follow the Supreme Court's guidance in *In re M.P.*, 639 S.W.3d 700 (Tex. 2022).

conduct of parents or others in the home are relevant to this inquiry. *In re J.W.*, 645 S.W.3d at 749.

"Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home under section D." *Jordan*, 325 S.W.3d at 721. "A parent's illegal drug use ... may also support a finding that the child's surroundings endanger his or her physical or emotional well-being." *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied). Under subsection (D), termination may be based on a single act or omission. *Jordan*, 325 S.W.3d at 721.

### 2. Section 161.001(b)(1)(E)

Family Code section 161.001(b)(1)(E) authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" TEX. FAM. CODE § 161.001(b)(1)(E).

To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A child is

15

endangered if her environment creates a potential for danger that the parent disregards. *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

For instance, intentional criminal activity that exposes a parent to incarceration is conduct that endangers a child's physical and emotional well-being. *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Although "imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child, ... incarceration does support an endangerment finding 'if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child.'" *In re J.F.-G.*, 627 S.W.3d at 312–13 (quoting *Boyd*, 727 S.W.2d at 533–34). Thus, the supreme court has held that "[a] parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *Id.* at 313. Additionally, "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d at 345. "Because it significantly harms the parenting relationship, drug activity can constitute endangerment even if it

transpires outside the child's presence." *In re N.J.H.*, 575 S.W.3d at 831. On this point, the supreme court has explained that endangerment does not require a parent's drug use to directly or physically harm the child. *See In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024). "Instead, a pattern of parental behavior that presents a substantial risk of harm to the child permits a factfinder to reasonably find endangerment." *Id.*

"A reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's 'ability to parent.'" *Id.* (quoting *In re J.O.A.*, 283 S.W.3d at 345).

Thus, a parent's "decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *In re N.J.H.*, 575 S.W.3d at 832 (internal quotations omitted).

"Termination under subsection (E) must be based on more than a single act or omission ...." *Id.* at 831. A parent's conduct before the child's birth and either before or after the child's removal by DFPS may be considered. *Walker*, 312 S.W.3d at 617. Offenses occurring before the child's birth can be considered as part of a voluntary, deliberate, and conscious course of conduct that has the effect of endangering the child. *Id.*

17

And "[a] parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional well-being." *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). To support termination under subsection (E), it is not necessary to establish that a parent intended to endanger the child. *Id.* And the endangering conduct need not have occurred in the child's presence. *Walker*, 312 S.W.3d at 617.

## 2.    Analysis

Father argues that the trial court could not have found that he was an illegal drug user because there was no evidence of his current drug use, he denied using drugs, and DFPS did not produce a single positive drug test for Father.

Father's denials aside, the evidence before the trial court supports an inference that Father's drug use endangered the child's physical or emotional well-being. "A fact finder reasonably can infer that a parent's failure to submit to court-ordered drug tests indicates the parent is avoiding testing because they were using illegal drugs." *In re A.R.D.*, 694 S.W.3d 829, 840 (Tex. App.—Houston [14th Dist.] 2024, pet. denied). Here, Father acknowledges his prior criminal convictions show a history of drug abuse. While Father told DFPS staff that he agreed to submit to a drug test early in the case, he was told at the drug testing site that he could not be tested because he did not bring identification with him, yet he did not return to the site with his

18

identification for testing. And Father, having had his parental rights to another child terminated in a prior proceeding, avoided service in this case until he was incarcerated and effectively declined to participate in the services designed to help him gain custody of Joseph. Those services included a drug and alcohol assessment/substance abuse assessment evaluation, any recommended inpatient or outpatient drug treatment, and random drug testing. On this record, the trial court was entitled to infer that Father avoided drug testing because he was continuing to use illegal drugs. *See id.*

Father asserts that there was no evidence of his home environment being unsafe or unstable before his incarceration. But again, his history of illegal drug use supports an inference of endangerment. *See In re E.M.*, 494 S.W.3d at 222. The trial court also could have considered the evidence that Father's parental rights to another child had been terminated on endangerment grounds in a separate case.

Evidence of a parent's criminal conduct, convictions, and imprisonment may support a finding of endangerment under subsection (E) because such conduct subjects a child to a life of uncertainty and instability. *In re E.S.T.*, No. 01-22-00404-CV, 2022 WL 17096713, at *12 (Tex. App.—Houston [1st Dist.] 2022, no pet.). Within the past eight years, father has had three criminal convictions for possession of methamphetamine, the most recent involving a much larger amount than the first two. During the time this case was pending in the trial court, father had

19

his community supervision in the most recent possession case revoked after he violated certain terms and he was sentenced to two out of a possible five years' confinement. Father minimizes the violations that led to revocation of his community supervision as "technical," but exposing himself to the likelihood of extended incarceration—by committing the underlying criminal act and violating the term of his community supervision—is conduct that endangers a child's physical and emotional well-being. *See Robinson v. Tex. Dep't of Protective & Reg. Servs.*, 89 S.W.3d 679, 686–87 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *see also* TEX. FAM. CODE ANN. § 161.001(1)(Q) (providing that termination may result if court finds that parent knowingly engaged in criminal conduct that resulted in conviction and confinement for more than two years and an inability to care for the child); *In re B.S.*, No. 01-22-00826-CV, 2023 WL 3099904, at *6 (Tex. App.—Houston [1st Dist. Apr. 27, 2023, no pet.) (recognizing that intentional criminal activity that exposes parent to incarceration is conduct that endangers child's physical and emotional well-being).

Viewing all the evidence in a light most favorable to the trial court's best-interest finding, and considering any undisputed evidence to the contrary, we conclude that a factfinder reasonably could have formed a firm belief or conviction that Father engaged in a course of conduct that endangered Joseph's physical and emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)D, (E).

20

And considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably could have formed a firm belief or conviction that Father engaged in a course of conduct that endangered Joseph's physical and emotional well-being. *See id.* § 161.001(b)(1)D, (E). Thus, we hold that the evidence is legally and factually sufficient to support the trial court's predicate findings supporting termination of Father's parental rights.

We overrule Father's second issue.

## E. Best Interest

Father also contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in Joseph's best interest.

The best-interest inquiry focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). A best-interest determination is guided by several nonexclusive factors, including: (1) the child's emotional and physical needs; (2) present and future emotional and physical danger to the child; (3) the parental abilities of the individuals seeking custody; (4) the plans for the child by those individuals and the stability of the home; (5) the plans for the child by the agency seeking custody and the stability of the proposed placement; (6) the parent's acts or omissions that may indicate the existing parent–child relationship is improper; and (7) any excuse for the parent's acts or omissions. *Id.*

(the "*Holley* factors," citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). We may also consider the statutory factors set forth in Family Code section 263.307. *See* TEX. FAM. CODE § 263.307; *In re A.C.*, 560 S.W.3d at 631 n.29. Proof of each of these factors is not a condition precedent to termination. *In re C.H.*, 89 S.W.3d at 27. The analysis may include direct and circumstantial evidence, the totality of the evidence, and subjective factors. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

Here, several factors support the trial court's finding that termination of Father's parental rights is in Joseph's best interest.

At the time of trial, Joseph was about two years old. "When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Shortly after his birth, Joseph was placed with the foster mother and has been cared for by her ever since. The foster mother described Joseph as a very happy child who loved to talk, and the caseworker stated that Joseph was happy every time she saw him. *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.) (considering, in assessing child's physical and emotional needs, that child was

22

"healthy, happy, and well-adjusted" after approximately eighteen months in care of foster family).

Father stopped visiting Joseph after seeing him twice in 2023. "Unless a parent has a valid excuse for his absence from a child's life, we have long considered evidence of little or no contact with the child to be proof that weighs heavily in favor of a trial court's best-interest finding." *In re K.W.*, No. 01-23-00530-CV, 2024 WL 116938, at *9 (Tex. App.—Houston [1st Dist.] Jan. 11, 2024, pet. denied) (mem. op.); *see In re A.J.D.-J.*, 667 S.W.3d 813, 824 (Tex. App.—Houston [1st Dist.] 2023, no pet.). "("Parental absence or lack of involvement is especially telling with respect to the best interest of very young children, like babies and toddlers, due to their inherent vulnerability and particular need for parental attention and nurturing.").

Father also avoided joining the proceedings and participating in services that could have led to a different result in this case. Under these circumstances, "the factfinder may reasonably infer that the parent is indifferent to the outcome." I*n re A.J.D.-J.*, 667 S.W.3d at 826. "[I]ndifference implicates all of the *Holley* factors." *Id.* at 827.

In contrast, the foster mother showed the trial court her abilities to parent Joseph and to provide a stable home for him. She has been proactive in caring for his physical, educational, and emotional needs and ensuring that he has ample opportunities to bond with her and other family members, including his half siblings.

The foster mother has expressed her interest in adopting Joseph. The evidence shows that Joseph is in a safe, stable home and is thriving.

Because the trial court heard directly from the foster mother, we defer to the trial court's assessment of her credibility and demeanor in crediting this testimony as evidence in favor of the trial court's best-interest finding. *See In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *In re S.G.A.R.*, No. 01-18-00291-CV, 2018 WL 4705835, at *7 (Tex. App.—Houston [1st Dist.] Oct. 2, 2018, pet. denied) (mem. op.).

Viewing all the evidence in a light most favorable to the trial court's best-interest finding, and considering any undisputed evidence to the contrary, we conclude that a reasonable factfinder could have formed a firm belief or conviction that a termination of Father's parental rights is in Joseph's best interest. *See In re J.W.*, 645 S.W.3d at 741.

And considering the entire record, including evidence both supporting and contradicting the trial court's finding, a factfinder reasonably could have formed a firm belief or conviction that a termination of Father's parental rights is in Joseph's best interest. *In re C.H.*, 89 S.W.3d at 25–26.

For these reasons, we hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See In re A.C.*, 560 S.W.3d at 630–31.

We overrule Father's third issue.

## Sole Managing Conservatorship

In his fourth issue, Father asserts that the evidence was legally and factually insufficient to support a finding that appointment of DFPS as managing conservator was in the child's best interests.

When the parental rights of all living parents of a child are terminated, the trial court must appoint a "competent adult, [DFPS], or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a); *In re J.D.G.*, 570 S.W.3d at 856. Conservatorship determinations are reviewed for an abuse of discretion and will be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re J.D.G.*, 570 S.W.3d at 856.

An order terminating the parent-child relationship divests a parent of legal rights and duties with respect to the child. *See* TEX. FAM. CODE § 161.206(b). Once we overrule a parent's challenge to an order terminating his parental rights, the trial court's appointment of DFPS as sole managing conservator may be considered a "consequence of the termination." *In re J.D.G.*, 570 S.W.3d at 856; *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (citation omitted).

Because we have overruled Father's challenges to the portion of the trial court's decree terminating his parental rights, the order divested Father of his legal rights and duties related to Joseph. *See* TEX. FAM. CODE § 161.206(b); *In re J.D.G.*, 570 S.W.3d at 856. As a result, Father lacks standing to challenge the portion of the order appointing DFPS as Joseph's conservator. *See In re S.M.M.*, No. 01-22-00482-CV, 2022 WL 17981669, at *12 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied) (mem. op.); *In re J.D.G.*, 570 S.W.3d at 856.

We overrule Father's fourth issue.

## Conclusion

We affirm the trial court's decree terminating the parent-child relationship between Father and Joseph.


Clint Morgan
Justice

Panel consists of Chief Justice Adams and Justices Morgan and Dokupil.