**Opinion issued January 22, 2026**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-25-00695-CV**

———————————

## IN THE INTEREST OF B.A.M. A/K/A B.M., A CHILD

---

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Case No. 2024-01768J**

---

## MEMORANDUM OPINION

This accelerated appeal arises from a suit brought by the Texas Department

of Family and Protective Services (DFPS) to terminate a parent-child relationship.

After a bench trial, the trial court terminated the parental rights of A.M.

(Mother) to her minor child, "Ben."[1] The trial court's Decree for Termination is

---

[1] Pursuant to the Texas Rules of Appellate Procedure, we use an alias to refer to the
child and to his parents. *See* TEX. R. APP. P. 9.8(b)(2) (providing that, in parental-

based on its findings under subsections 161.001(b)(1)(D), (E), (O), and (P) of the Texas Family Code and that termination of the parent-child relationship is in Ben's best interest. Mother now argues that there is insufficient evidence to support the trial court's decision to terminate her parental rights.

We affirm.

## Background

Ben was born on July 22, 2024. Mother tested positive for methamphetamines at his birth—Ben tested negative. Mother also admitted to using methamphetamines and that the last time she used was the week prior to Ben's birth. And at the time of Ben's birth, Mother was homeless. She has four other children with Ben's Father[2] that have been removed from her care. DFPS was unable to place Ben with Father because Father also has a history of methamphetamine use and a previous history of sexual abuse. Because DFPS could not find an appropriate placement for Ben, he was taken into DFPS's custody.

Mother has an extensive history of substance abuse, as well as a history with CPS. In previous CPS investigations, Mother admitted to both methamphetamine

---

rights termination cases, "the court must, in its opinion, use an alias to refer to a minor, and if necessary to protect the minor's identity, to the minor's parent or other family member"). In its brief, DFPS refers to the child as "Ben."

[2] DFPS also sought to terminate Father's parental rights. Following the bench trial, the trial court terminated Father's parental rights under subsections 161.001(b)(1)(D), (E), (N), and (O) of the Texas Family Code. Father did not appeal the trial court's decree of termination and is not a party to this appeal.

and cocaine use, and she tested positive for both during a previous pregnancy. Her parental rights to one of her children have been terminated. And the other three children were removed from her custody and placed with her great aunt, in part because all three children tested positive for either methamphetamine or cocaine, or both.

After Ben's removal, Mother completed a three-month inpatient substance abuse program and tested negative in her court-ordered drug tests for three months after her release. But in the six months leading up to trial, Mother tested positive for cocaine once and missed five other drug tests.

Mother also has a history of violent conduct and criminal convictions. For instance, in 2015, she was convicted of resisting arrest, a class A misdemeanor, and received a punishment of 5 days jail credit. In 2020, Mother was convicted of abandoning or endangering a child, a state jail felony, and was assessed a punishment of two years in state jail. The trial court suspended confinement for this conviction and placed Mother on community supervision. And in August 2022, the trial court entered a judgment revoking community supervision and sentencing Mother to 64 days in county jail. Also in August 2022, Mother was convicted of assault involving family violence, a class a misdemeanor, and was sentenced to 110 days in county jail. Mother additionally admitted to domestic violence between her and Father that occurred in front of their children.

At the time of trial, Mother had obtained stable employment and was no longer unhoused. She also attended weekly visits with Ben throughout the pendency of this case, although she had missed several visits in the months leading up to trial.

Finally, by the time of trial, Ben had been living with his foster family for almost a year—since his birth—and was bonded with the family. And Ben's foster parents wish to adopt him.

In its decree for termination, the trial court terminated Mother's parental rights to Ben after finding that she engaged in the predicate acts set forth in subsections 161.001(b)(1)(D), (E), (O), and (P) of the Family Code and that termination of her parental rights is in Ben's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O), (P), (b)(2).

## Termination of Mother's Parental Rights

Mother now argues on appeal that the evidence is legally and factually insufficient to support the trial court's findings.

### A. Standard of Review

A parent's "right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Id.* at 759. "A parent's interest in the

4

accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." *Id.* (internal quotations omitted). Thus, we strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

"[T]he rights of natural parents are not absolute[,] protection of the child is paramount," and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Recognizing that a parent may forfeit her parental rights based on her actions or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id.*

Accordingly, "[i]n parental termination cases, due process mandates a clear and convincing evidence standard of proof." *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019); *see also* TEX. FAM. CODE § 161.001(b). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "This heightened burden of proof affects the standard of review in an evidentiary challenge on appeal." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022).

"To that end, in reviewing a legal-sufficiency challenge, we must determine whether a reasonable trier of fact could have formed a firm belief or conviction that

5

its finding was true." *Id.* (internal quotations omitted). "[W]e look at all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (internal quotations omitted). We may not, however, "disregard undisputed facts that do not support the finding." *Id.* (internal quotations omitted).

In conducting a factual-sufficiency review in this context, a reviewing court should give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *See In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). And the court should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

Under these standards, the factfinder remains "the sole arbiter of the witnesses' credibility and demeanor." *In re J.W.*, 645 S.W.3d 726, 741. In a bench trial, the trial court, as factfinder, weighs the evidence and resolves evidentiary

conflicts. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

**B.    Applicable Law**

Section 161.001(b) of the Family Code authorizes an "involuntary termination of parental rights if a court finds by clear and convincing evidence both that a parent engaged in one or more enumerated predicate grounds for termination and that termination is in the best interest of the child." *In re M.P.*, 639 S.W.3d 700, 701–02 (Tex. 2022) (citing TEX. FAM. CODE § 161.001(b)(1)(A)-(U), (b)(2)).

Generally, "[o]nly one predicate ground and a best interest finding are necessary for termination, so 'a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground.'" *Id.* (quoting *In re N.G.*, 577 S.W.3d at 232).

Although only one predicate ground is necessary to support a judgment of termination, we may not bypass challenges to the sufficiency of the evidence to support findings under subsections 161.001(b)(1)(D) and (E)—"the so-called endangerment grounds." *In re J.W.*, 645 S.W.3d at 748. "Those grounds bear special significance because termination of a parent's rights under either can serve as a ground for termination of h[er] rights to *another* child." *Id.*; *see* TEX. FAM. CODE § 161.001(b)(1)(M). "[B]ecause prior termination for endangerment is a predicate

ground for a future termination, due process and due course of law require that the court of appeals review the legal and factual sufficiency of the evidence supporting a trial court's order of termination under Subsections 161.001(b)(1)(D) and (E) when challenged on appeal." *In re M.P.*, 639 S.W.3d at 704.

Because Mother challenges the trial court's findings under subsections (D) and (E), thus implicating due process concerns, we must address those findings first. *See id.*

## C. Endangerment Findings

### 1. Section 161.001(b)(1)(D)

Section 161.001(b)(1)(D) of the Family Code authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D).

To establish subsection (D), DFPS must prove that the parent's conduct caused a child to be placed or remain in an "endangering environment." *In re J.W.*, 645 S.W.3d at 749; *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). The suitability of the child's living conditions and the conduct of parents or others in the home are relevant to this inquiry. *In re J.W.*, 645

8

S.W.3d at 749. And, generally, the relevant time frame for evaluating termination under subsection (D) is before the child's removal. *See id.* & n.12.

"Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home under section D." *Jordan*, 325 S.W.3d at 721. "A parent's illegal drug use . . . may also support a finding that the child's surroundings endanger his or her physical or emotional wellbeing." *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied). Furthermore, a mother's use of controlled substances during pregnancy "[c]ertainly" creates a dangerous environment for the unborn child. *See In re J.W.*, 645 S.W.3d at 749. Under subsection (D), termination may be based on a single act or omission. *Jordan*, 325 S.W.3d at 721.

In this case, DFPS became involved immediately after Ben's birth, and he was removed and placed with an unrelated foster family upon his discharge from the hospital. Mother has had only supervised visits with him since his birth and has had no say in his living conditions. Accordingly, Mother contends that there "was never an environment in which Mother and [Ben] were together after [Ben's] birth" and, therefore, no evidence supports the trial court's subsection (D) finding.

We disagree. DFPS Caseworker Karen Dowe testified that DFPS removed Ben from Mother's care immediately after his birth because she tested positive for

9

methamphetamines. Dowe also testified that Mother admitted to using methamphetamine several weeks before Ben was born. The same evidence was contained in the removal affidavit, which was admitted at trial without objection. And Mother herself testified that she used methamphetamine while pregnant with Ben.

Based on Mother's admitted methamphetamine use throughout her pregnancy and her positive test for methamphetamine at Ben's birth, the trial court could have formed a firm belief or conviction Mother's actions endangered Ben by knowingly placing him or allowing him to remain in conditions or surroundings endangering his physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(D); *In re J.W.*, 645 S.W.3d at 749 (analyzing subsection (D) and stating that "[c]ertainly, Mother's use of controlled substances while pregnant created a dangerous environment for J.W.").[3] We therefore hold the evidence is both legally and factually sufficient to support the trial court's endangerment finding under subsection (D). *See* TEX. FAM. CODE § 161.001(b)(1)(D).

---

[3] *See also In re V.M.C.G.*, No. 04-24-00578-CV, 2025 WL 871630, at *4 (Tex. App.—San Antonio Mar. 19, 2025, pet. denied) (mem. op.) (holding that evidence was legally and factually sufficient to support trial court's endangerment finding under subsection (D) based on mother's admitted methamphetamine use during pregnancy and her positive test for methamphetamine at child's birth).

## 2.    Section 161.001(b)(1)(E)

Section 161.001(b)(1)(E) of the Family Code authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E).

To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A child is endangered if her environment creates a potential for danger that the parent disregards. *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

For instance, "[i]ntentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child." *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Abusive and violent criminal conduct by a parent can also produce an environment that endangers a child's well-being, and evidence that a person has

11

engaged in such conduct in the past permits an inference that the person will continue violent behavior in the future. *Jordan*, 325 S.W.3d at 724; *Walker*, 312 S.W.3d at 617. And "[e]vidence as to how a parent has treated another child or spouse is relevant regarding whether a course of conduct under [sub]section E has been established." *Jordan*, 325 S.W.3d at 724.

Although "mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child, . . . incarceration does support an endangerment finding 'if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child.'" *In re J.F.-G.*, 627 S.W.3d 304, 312–13 (Tex. 2021) (quoting *Boyd*, 727 S.W.2d at 533–34). Thus, our supreme court has held that "[a] parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *Id.* at 313.

Additionally, "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "Because it significantly harms the parenting relationship, drug activity can constitute endangerment even if it transpires outside the child's presence." *In re N.J.H.*, 575 S.W.3d at 831. On this point, our supreme court has explained that endangerment does not require a parent's drug use to directly or

12

physically harm the child. *See In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024). "Instead, a pattern of parental behavior that presents a substantial *risk* of harm to the child permits a factfinder to reasonably find endangerment." *Id.* (emphasis added).

"A reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's 'ability to parent.'" *Id.* Thus, a parent's "decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *In re N.J.H.*, 575 S.W.3d at 832 (internal quotations omitted).

"Termination under subsection (E) must be based on more than a single act or omission . . . ." *Id.* at 831. A parent's conduct prior to the child's birth and either before or after the child's removal by DFPS may be considered. *Walker*, 312 S.W.3d at 617. Offenses occurring before the child's birth can be considered as part of a voluntary, deliberate, and conscious course of conduct that has the effect of endangering the child. *Id.*

And "[a] parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional well-being." *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). To support termination under subsection (E), it is not

13

necessary to establish that a parent intended to endanger the child. *Id.* And the endangering conduct need not have occurred in the child's presence. *Walker*, 312 S.W.3d at 617.

Here, DFPS presented sufficient evidence to support the trial court's finding under subsection (E) that Mother engaged in conduct that endangered Ben's physical or emotional well-being. For instance, DFPS presented evidence of Mother's long-term substance abuse problem that affected her ability to parent. *See In re R.R.A.*, 687 S.W.3d at 278. Mother tested positive for methamphetamines the day Ben was born, which is why he was removed from her care. She also admitted to using methamphetamines, even as recently as the week prior to giving birth to Ben. In the removal affidavit, DFPS Investigator Demetrius Travis detailed Mother's previous CPS history from 2020, 2021, and 2022 involving her other children. This prior CPS history reflected that Mother had a history of methamphetamine and cocaine use, and that she had tested positive for methamphetamines and cocaine during at least one prior pregnancy.

Furthermore, as part of her family service plan, Mother was required to submit to random drug tests. The evidence presented at trial shows that Mother submitted to random drug tests in October, November, and December 2024, and tested negative all three times. However, she failed to appear for testing in January and February 2025. Mother then tested positive for cocaine in March 2025. And thereafter again

14

failed to appear for testing in April, May, and June 2025. The trial court was entitled to find her failure to participate in the drug tests as equivalent to a positive test result. *See In re S.C.M.*, No. 01-22-00964-CV, 2023 WL 3873342, at *8 (Tex. App.— Houston [1st Dist.] June 8, 2023, pet. denied) (mem. op.) (stating trial court may treat failure to participate in court-ordered drug test as positive test result).

Accordingly, the evidence in this record supports a finding that Mother continued to use drugs in the six months leading up to trial despite the knowledge that her parental rights were subject to termination. *See In re J.O.A.*, 283 S.W.3d at 346 (listing father's use of marijuana "shortly before the final hearing" as evidence in favor of termination); *In re N.J.H.*, 575 S.W.3d at 831–32. A parent's use of illegal drugs constitutes endangering conduct because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker*, 312 S.W.3d at 617; *see also In re J.O.A.*, 283 S.W.3d at 345.

We acknowledge there is some contradicting evidence of Mother's drug use in the record; including that Mother missed her drug tests due to transportation issues and always rescheduled them, that she successfully completed an inpatient rehabilitation program , and her testimony that she had been sober since she left that program. We agree that "a parent's efforts to improve or enhance parenting skills are also relevant in determining whether a parent's conduct results in endangerment under [s]ubsection E." *In re P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at

15

*10 (Tex. App.—Houston [1st Dist.] Dec. 10, 2017, pet. denied) (mem. op.). Nonetheless, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d at 346.

And the trial court, as the sole arbiter of credibility and demeanor, could have weighed the conflicting evidence and chosen to disbelieve Mother's testimony with respect to her sobriety and failure to attend the drug tests. *See In re J.W.*, 645 S.W.3d at 741; *In re R.J.*, 579 S.W.3d at 117. But even if Mother's drug use was not ongoing, evidence of her past drug use is part of a course of conduct that endangered Ben's well-being because it exposed Mother to future jail time. *See In re E.S.T.*, No. 01-22-00404-CV, 2022 WL 17096713, at *15 (Tex. App.—Houston [1st Dist.] Nov. 21, 2022, no pet.) (mem. op.); *see also Walker*, 312 S.W.3d at 617.

Moreover, DFPS presented evidence that Mother's past conduct, including violent conduct, endangered her other children. As described in the removal affidavit, a 2020 CPS investigation determined that three of Mother's other children—two of whom were nine-month-old infants—"tested positive for either methamphetamines, cocaine or both" in hair follicle tests. This incident resulted in criminal charges against Mother.[4]

---

[4] Although not entirely clear from the record, it appears that this incident resulted in Mother's 2022 conviction for endangerment of a child based on criminal negligence, for which she was sentenced to 64 days in county jail. The date of the

16

As part of that same CPS investigation, Mother admitted to domestic violence between herself and Father.  And many of these physical altercations occurred in front of their children.  For example, Mother once "tried to go after [Father] with a knife," and did so while holding one of her children.  And, on two occasions, she broke windows in Father's home during their arguments.  At least one of these fights occurred in front of the children.  Moreover, Mother admitted that she walked in on Father masturbating on their 9-month-old twins.  Despite seeing this, she admitted she still allowed him to have access to the children after this incident and ultimately had another child—Ben—with him.

Additionally, a 2022 CPS investigation detailed a physical altercation between Mother and her sister, K.K., which was described as "ongoing" and that "police have responded to similar issues in the past."  During this incident, Mother yelled at her sister, called her names, and "ran at [her sister] to physically assault" her.  K.K.'s children were present for this incident.  One of K.K.'s children tried to defend his mother and stop the fight, and Mother pushed him.  Mother also broke the window of K.K.'s apartment.  She was arrested and ultimately convicted of assault family violence.  Mother was sentenced to 110 days in county jail for this conviction.

offense as listed in the judgment revoking community supervision is May 12, 2020. And the time frame for this CPS investigation as described in the removal affidavit is April 27, 2020 – June 26, 2020.

As explained above, evidence of abusive and violent conduct by a parent can produce an environment that endangers a child's well-being, and evidence that a person has engaged in such conduct in the past permits an inference that the person will continue violent behavior in the future. *Jordan*, 325 S.W.3d at 724; *Walker*, 312 S.W.3d at 617. The fact that Mother's violent behavior and convictions occurred before Ben's birth, or that none of her conduct involved physical injury to Ben, did not prohibit the trial court from considering those facts as evidence of endangerment. As noted above, it is not necessary that DFPS establish that a parent intended to endanger a child in order to support termination of the parent-child relationship. *See In re J.D.G.*, 570 S.W.3d at 851. The specific danger to a child's well-being may be inferred from parental misconduct standing alone, even if the conduct is not directed at the child and the child suffers no actual injury. *See Boyd*, 727 S.W.2d at 533. And courts may consider parental conduct that did not occur in a child's presence, including conduct before the child's birth and after the child was removed by DFPS. *Walker*, 312 S.W.3d at 617. Here, the trial court could have inferred from the evidence related to Mother's pattern of abusive and violent behavior, as well as her exposure of her children to Father's abusive and violent behavior, even if that behavior was not directed at Ben or occurred before his birth, that she engaged in a pattern of conduct that put Ben in danger, or that she would engage in conduct in the future that would endanger Ben.

Thus, considering the evidence in the light most favorable to the trial court's finding under Section 161.001(b)(1)(E), we conclude that a reasonable trier of fact could have formed a firm belief or conviction that Mother endangered Ben's physical or mental well-being. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of a finding of endangerment under Section 161.001(b)(1)(E) or was not so significant that the factfinder could not reasonably have formed a firm belief or conviction regarding Mother's endangerment of Ben. Accordingly, we hold that legally and factually sufficient evidence supports the trial court's findings under Section 161.001(b)(1)(E).[5] *See* TEX. FAM. CODE § 161.001(b)(1)(E).

## D. Best Interest of the Child

Mother also asserts that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in Ben's best interest. We disagree.

### 1. Applicable Law

The best-interest inquiry focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). A best-interest

---

[5] Because the evidence support's termination of Mother's parental rights under subsections 161.001(b)(1)(D) and (E), we do not separately address Mother's remaining issues challenging the trial court's other predicate grounds for termination. *See In re N.G.*, 577 S.W.3d 230, 237 & n.1 (Tex. 2019); TEX. R. APP. P. 47.1.

determination is guided by several non-exclusive factors, the "*Holley* factors," including: (1) the child's desires; (2) the child's emotional and physical needs; (3) present and future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *See id.*; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). We may also consider the statutory factors set forth in Section 263.307 of the Family Code. *See* TEX. FAM. CODE § 263.307; *In re A.C.*, 560 S.W.3d at 631 n.29.

It is not necessary that DFPS prove all of these factors as a condition precedent to termination. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Accordingly, the absence of evidence concerning some of the factors does not preclude a factfinder from forming a firm belief or conviction that termination is in a child's best interest. *Id.*

**2.    Analysis**

Based on the above standards, several factors support the trial court's finding that termination of Mother's parental rights is in Ben's best interest.

First, at the time of trial, Ben was almost a year old. "When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

The evidence at trial demonstrated that Mother was bonded with Ben, attended regular visits, and brought him toys and gifts. And Dowe testified that Mother acted appropriately during these visits. Mother also maintained stable employment, was an active participant in this case, and completed many aspects of her family service plan. Additionally, while she was homeless at the time of removal, by the time of trial Mother had found housing with her mother and testified that she intended to live with her mother for at least a year so she could save money for an apartment. However, due to her mother's own CPS history, Dowe testified that DFPS would not allow Ben to be released to that home.[6]

But the trial court also heard testimony that Ben was well-cared-for by his foster family. Ben was placed into foster care when he was just days old. And he has been with the same foster family for his entire life. Dowe testified that Ben has bonded with his foster family, including the other child in the home, and that the foster family wants to adopt him. Ben's foster mother testified to the same. *See In*

---

[6] In contrast, Mother's mother denied having CPS history.

*re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (stating that stability and permanence are important to upbringing of child and affirming that termination was in child's best interest when child was thriving in foster care). DFPS also introduced evidence that Ben's foster home is safe and provides for all of his needs. Ben is happy and thriving in his current placement and is meeting all of his milestones. *See In re J.D.*, 436 S.W.3d at 118 (considering, in assessing child's physical and emotional needs, evidence that child had been in foster home for most of her life and that foster family provided safe and stable home and planned to adopt her as supporting trial court's best-interest finding). On balance, the above evidence supports the trial court's best-interest finding under the second and seventh *Holley* factors. *See Holley*, 544 S.W.2d at 372 (factors two and seven).

Next, as detailed above, the evidence shows that Mother has a long history of substance abuse, including methamphetamines and cocaine, which continued during the pendency of this case. Ben was removed from Mother's case because she testified positive for methamphetamines at his birth. There was also evidence introduced that several of Mother's other children had previously tested positive for methamphetamines or cocaine while under her care. And Mother admitted to methamphetamine use at the time Ben was removed, as well as during the previous CPS investigations involving her other children.

Although there was evidence that Mother completed an inpatient drug rehabilitation program after Ben was removed and claimed she had been sober since completing treatment, there was also evidence that Mother tested positive for cocaine in March—four months before trial and *after* she had completed treatment— and failed to submit to five additional drug tests in the six months leading up to trial. A factfinder may reasonably infer that a parent's failure to completed scheduled screening indicates that she is avoiding testing because she is using drugs. *See, e.g.*, *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.).

"A factfinder may afford great weight to the significant factor of drug-related conduct." *In re N.J.H.*, 575 S.W.3d at 834. A parent's drug use is a condition indicative of instability in the home environment because it exposes a child to the possibility that the parent may be impaired or imprisoned. *Walker*, 312 S.W.3d at 617. Here, evidence of Mother's past drug use, coupled with the evidence that Mother failed drug tests during the pendency of this case—while she was aware that her parental rights to Ben were at issue—supports an inference that Mother is at risk for continuing substance abuse. *See In re K.W.*, No. 01-23-00530-CV, 2024 WL 116938, at *10 (Tex. App.—Houston [1st Dist.] Jan. 11, 2024, pet. denied); *In re*

23

*R.J.*, 579 S.W.3d at 118 (recognizing that trial court may measure parent's future conduct by his past conduct).[7]

Thus, this evidence of Mother's past pattern of drug use "is relevant, not only to h[er] parenting abilities and to the stability of the home [s]he would provide, but also to the emotional and physical needs of h[er] child, now and in the future, and to the emotional and physical danger in which the child could be placed, now and in the future." *See In re N.J.H.*, 575 S.W.3d at 834; *Holley*, 544 S.W.2d at 372 (factors two, three, four, and seven); *see also In re C.H.*, 89 S.W.3d at 28 (holding that same evidence may be probative of both section 161.001(b)(1) and best-interest grounds).

Additionally, as detailed above, the trial court heard evidence of Mother's past endangering conduct, including her criminal and violent behavior. A parent's abusive or endangering conduct may be considered in a best-interest analysis even when it occurred before the child's birth or was not directed at the child. *See In re G.M.G.*, 444 S.W.3d 46, 59 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

For example, Mother has three criminal convictions. One of these was a state-jail-felony conviction for child endangerment, which appears from the record to likely be related to Mother's other children testing positive for methamphetamines.

---

7   *See also In re S.C.M.*, No. 01-22-00964-CV, 2023 WL 3873342, at *13 (Tex. App.—Houston [1st Dist.] June 8, 2023, pet. denied) (mem. op.) (considering evidence that father tested positive for drugs one month after child was born and refused to submit to first court-ordered drug test as support for trial court's finding that termination was in child's best interest).

The most recent conviction, from 2022, was for assault involving family violence for "punching, biting, and hitting" her sister. There was also evidence of Mother's admissions of domestic violence with Father and that these altercations occurred in front of their children. Finally, the trial court heard evidence that Mother continued to allow Father, who also had a long history of substance abuse, to be around her children—and ultimately had another child (Ben) with him—even after witnessing him masturbating on their twin infants. This evidence supports the trial court's best interest finding under the third *Holley* factor. *See Holley*, 544 S.W.2d at 372; *see also* TEX. FAM. CODE § 263.307(b)(7) ("whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home"), (b)(12)(E) ("protection from repeated exposure to violence even though the violence may not be directed at the child").[8]

We acknowledged above that there is some evidence weighing against a finding that termination is in Ben's best interest. But even considering that evidence we conclude that, on balance, the evidence demonstrates that the applicable statutory and *Holley* factors weigh in favor of the trial court's best-interest finding.

---

[8] *See, e.g.*, *In re A.K.T.*, No. 01-18-00647-CV, 2018 WL 6423381, at *16 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, pet. denied) (mem. op.) (mother's extensive history of violent abusive conduct directed at child, father, and other individuals supported best-interest finding); *In re J.I.T.P.*, 99 S.W.3d 841, 846 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (domestic violence, even when child is not intended victim, supports finding that termination is in child's best interest).

Accordingly, considering the evidence in the light most favorable to the trial court's best-interest finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of Mother's parental rights was in Ben's best interest. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's best interest finding or was not so significant that the factfinder could not reasonably have formed a firm belief or conviction that termination of Mother's parental rights was in Ben's best interest. We therefore hold that legally and factually sufficient evidence supports the trial court's best-interest finding. *See* TEX. FAM. CODE § 161.001(b)(2).

## Conclusion

We affirm the trial court's decree for termination.

Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Gunn and Johnson.